Barnard, P. J.
If the Farrett patent is to be deemed the foundation of the title to the lands in question the conveyance was to the town or commonalty and not to the individuals whose name are in the patent, together with their associates, then living. The charter contained provisions “ that they and their associates, shall enjoy as full and free liberty in all matters that do or may concern them or theirs or that may conduce to the comfort of them and theirs, both in church order and civil government,” which other-plantations enjoy in Massachusetts bay. It was a grant off land to a civil commonalty. It provides for trade with the Indians and that no one can buy land or take a gift of the same “but only the aforesaid inhabitants shall make purchase in their own names at their own leisure from any Indians that inhabit or have lawful right to buy of the aforesaid lands or any part thereof and thereby assume iff *515 to themselves and their heirs as an inheritance forever.” These inhabitants have, by the interpretation put upon the charter by the deputy of the Earl of Stirling who made it, had, “ all title to government, whether in church or commonwealth.” It is clear, therefore, from the charter, that the lands were granted to the inhabitants of a civil commonalty, and for the general good of such a commonalty, and not to the individual inhabitants as tenants in common.
It is extremely probable that this charter is of no force. By its terms it was to be approved in some way by Governor Winthrop, of Massachusetts, and he did grudgingly approve it, fixing the price of four bushels of Indian corn as a consideration of the rent, to be paid yearly by the inhabitants of the tract * * * and their successors forever.
It is historically known that there was a long quarrel between Massachusetts and the English government, as to whether Long Island was within the jurisdiction of Massachusetts, and this was finally settled against Massachusetts. The Stirling grant was in 1640. In 1616, the English Governor Andros, under the Duke of York, granted the lands in question to certain named persons, on behalf of themselves and their associates, the freeholders and inhabitants of the said town, their heirs, successors and assigns. It was provided in the Andros charter that the tenure of the said lands and premises to be according to •the custom of the manor of East Greenwich, in the county of Kent, in England, in free and common socage and by fealty only. It was further provided that all the lands and plantations within the said limits or bounds shall have relation to the town in general for the well government thereof. The grant was accompanied by a grant and of “all the privileges and immunities belonging to'a town with this government.” This charter plainly grants lands to a civil community under the name of freeholders and inhabitants of the town of Southampton, and the lands were to be held for the common benefit. The fact that some of the proceedings recite the grantees purchases, and even show contribution therefor, in different sums, has no relevancy.
A new community would naturally acquire lands through the aid of its members according to their ability, but it is to be inferred that when the title was obtained, subscribers to the fund would be paid in lands according to their several amounts. No civil community could hold lands for the common good of all if its inhabitants ’held a title as tenants in common. The Andros.patent was conferred by the government of James II., king of England, in 1636. This charter recites that “his most sacred majesty has *516 made inquiry, and finds that the freeholders of the town of Southampton aforesaid have lawfully purchased the lands, within the limits and bounds aforesaid, of the Indians and have paid them according to agreement, so that all the Indians’ right by virtue of said purchase is invested into the freeholders of the town of Southampton.”
The charter then gives all the lands to a body corporate, “by the name of the trustees of the freeholders and commonalty of the town of Southampton, or their successors.” These trustees for the inhabitants were clothed by the charter with power to possess all the lands unappropriated to individuals before it was granted. Power was given to elect trustees and other town officers. In view of the terms and purposes of these charters, there does not seem to be any doubt but that the title is in the plaintiff.
It is true that there has been, as shown by the very voluminous case, a dual government of the common lands, one by the plaintiffs representing the town meeting and by trustees of the proprietors, so-called. Both appear to have held for two hundred years to one purpose, namely to apply the proceeds of the common lands to the purpose of the town, including all its inhabitants. The act of the legislature creating a corporation to manage the lands held in the proprietors as tenants in common, does not affect the question under consideration. If the lands belonged to the town, the legislature could not change the title, but the waters, by the act itself, were still to be managed by the' town trustees “for the benefit of the town.” Land and waters are acquired by the same title, and the legislature did not intend to change the title to either. Since the passage of the act, the town trustees have controlled Mecox Bay.
In 1819, they passed a resolution regulating its use izi respect to oysters, which stands to the present time, as far as the evidence discloses.
The judgment should, therefore be affirmed, with costs.
Dykman, J., concurs.